**MERCHANTS MATRIX CUT SYNDI-CATE, Inc., Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 12197.**

United States Court of Appeals
Seventh Circuit.

Sept. 3, 1958.

Rehearing Denied En Banc Nov. 4, 1958.

748

Robert Tieken, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Chief, Appellate Section, U. S. Dept. of Justice, Washington, D. C., Luther D. Swanstrom, Asst. U. S. Atty., Chicago, Ill., for appellant.

Edward B. Lucius, Edward G. Lucius, Chicago, Ill., for appellee.

Before FINNEGAN, SCHNACKEN-BERG, and PARKINSON, Circuit Judges.

FINNEGAN, Circuit Judge.

Merchants Matrix Cut Syndicate, Inc., brought suit in the United States District Court for the Northern District of Illinois seeking recovery under the Federal Tort Claims Act, 28 U.S.C. § 1346 (b) for damages alleged to have been caused by the wrongful, wilful, and negligent acts of the officers and employees of the General Services Administration "and the officers, employees and agents of Clark-Congress Corporation." But of the latter, Merchants expressly alleged: "Clark-Congress Corporation has not been made a party defendant herein, as it has been previously sued by this plaintiff by reason of the matters and things herein set forth, has been held to be a joint tort-feasor with respect thereto, and a judgment has heretofore been entered in favor of this plaintiff (Merchants) against said Clark-Congress Corporation by reason thereof in this (District) Court." This allegation refers to Merchants' cross-claim against its landlord, Clark-Congress Corporation, on which judgment was entered June 26, 1953, subsequently reversed by our Court on January 17, 1955, (filed during condemnation proceedings) as United States v. Merchants Matrix Cut Syndicate, 7 Cir., 1955, 219 F.2d 90. In the case now before us the government, defendant, has appealed a judgment order, entered below July 23, 1957, awarding Merchants damages of $104,123.18 for alleged torts relating to actions taken in connection with the government's use and occupation of the Rand-McNally Building, Chicago, Illinois.

Our opinion, just cited, and Intertype Corporation v. Clark-Congress Corporation, 7 Cir., 1957, 240 F.2d 375; United States v. Advertising Checking Bureau, 7 Cir., 1953, 204 F.2d 770; Meyer v. United States, Ct.Cl.1958, 159 F.Supp. 333, and Meyer v. United States, 1957, 138 Ct.Cl. 86, 150 F.Supp. 314 are varying and related aspects of the basic controversy.

United States v. Merchants Matrix Cut Syndicate, 7 Cir., 1955, 219 F.2d 90, was a condemnation proceeding by the gov-

ernment in which, among others, Merchants Matrix Cut Syndicate, Inc., as tenant was joined as defendant along with its landlord, Clark-Congress Corporation. Merchants then cross-claimed, in that condemnation suit, against its co-defendant Clark-Congress seeking damages, Merchants received $44,027.91, on its cross-claim, from Clark-Congress and the latter appealed. Despite some opposite views persistently adhered to by these litigants, we, in our previous opinion (219 F.2d 90, 99) said: "* * * judgment entered on the * * * cross-claims of Merchants Matrix Cut Syndicate, Inc., * * * is hereby reversed and remanded to the District Court with directions to *sustain* the * * * motions of Clark-Congress Corporation to strike (the) cross claim." We struck down this cross-claim, among the others, on the merits. See at page 96 of 219 F.2d. Just why both sides still insist that cross-claim has vitality has not been given any legalistic reason, even if it were relevant. Our opinion was handed down on January 17, 1955 and the tort action, now before us, went on trial in the district court commencing April 19, 1957.

In any event the condemnor-plaintiff government was neither a party nor privity to the cross-claim just described. We said, based on the authorities cited in our earlier opinion, that expenses of removal and consequential damages could not be included in just compensation computed as and for a condemnation award.

■ Earlier the issue of conspiracy between Clark-Congress and the government to oust Merchants was actually litigated and when the question came before us on review we held (219 F.2d 90) that there was absent any such showing. We also said, and still adhere to the view, that moving, packing and other expenses discussed in United States v. Merchants Matrix Cut Syndicate, 7 Cir., 1955, 219 F.2d 90, 97–99 simply could not be recovered in eminent domain proceedings. Now the government seeks to invoke that judgment (219 F.2d 99) and the opinion written by the late

Judge Lindley, reported as Intertype Corporation v. Clark-Congress Corporation, 7 Cir., 1957, 240 F.2d 375, to overturn the judgment appealed. It could be said Merchants is attempting to impose liability on a new adversary, the government, despite the two earlier judgments or in the face of some precedent—*res adjudicata* and *stare decisis* both having been interposed by the government in the district court. Failure to establish the conspiracy would not necessarily rule out the possible existence of other actual tortious acts by government agents for which redress might be obtained under the Tort Claims Act. What Merchants is urging in substance is that the government acquired interests in its sovereign capacity and then as a co-tenant pursued a tortious course of conduct, the conspiracy element aside, causing damage to Merchants. This later point was not litigated before this because no such claim was asserted against the United States as a tort-feasor. Concededly all items in the reversed judgment against Clark-Congress are also included in the current judgment against the government.

■ Under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C., the following relevant findings of fact can be left undisturbed except as stated below.

"1. Merchants Matrix Cut Syndicate, Inc., first became a tenant in the Rand McNally Building, 536–538 South Clark Street, Chicago, Illinois, in the year 1915, and remained a tenant in said building continuously thereafter under various leases, so that Merchants Matrix Cut Syndicate, Inc., was on June 22, 1951, in lawful and peaceable possession and use and occupancy of approximately 8600 square feet of space, consisting of various rooms connected by corridors, on the 8th floor of said Rand McNally Building under and by virtue of two certain leases, one from Rand McNally & Company dated May 19, 1949, for a period beginning on June 16, 1949, and ending August 31, 1953, and the other, as to Room 844 only, from Clark-Congress Corporation, dated April 27, 1951, for a period

commencing May 1, 1951, and ending August 31, 1953. Clark-Congress Corporation purchased the building from Rand McNally & Company on June 30, 1949, and was the landlord of Merchants Matrix Cut Syndicate, Inc., and Clark-Congress Corporation also was the landlord of the United States of America (G.S.A.) after entering into a lease with the United States of America on June 22, 1951, which lease is Plaintiff's Exhibit No. 18, and which leasing was a voluntary leasing by both parties thereto.

"2. Merchants Matrix Cut Syndicate, Inc., was using and occupying said premises by engaging therein in the business of manufacturing newspaper matrices, stereotypes and thermal and plastic plates, all to be used for advertising purposes. It had in and on said premises certain heavy machines ranging in weight from 1 to 8 tons, and a number of said machines, which were continuously used in Merchants' production, were connected to live steam, electricity, gas and water, and it was necessary to the use of these machines that these services be furnished to said machines. Merchants Matrix Cut Syndicate, Inc., was operating its manufacturing plant in the Rand McNally Building on a three shift, 24 hour a day basis, and was engaged in a delicate manufacturing process in that the plates used for fine newspaper ad reproduction had up to 120 lines per square inch in them, and a pressure of approximately 600 tons per square inch was put on said plates when pressing mats from them. The customers of Merchants Matrix Cut Syndicate, Inc., were newspapers in Chicago, such as the Chicago Tribune, Chicago Daily News, Chicago American and Chicago Sun-Times, and various other large newspapers located throughout the United States, various large monthly and weekly national magazines, and various advertising agencies. Speed in meeting advertising publication deadlines in the delivery of its products was an essential to the successful operation of the business of Merchants Matrix Cut Syndicate, Inc.

"3. The services necessary to Merchants Matrix Cut Syndicate, Inc.'s business operations, such as 24 hour elevator service and live steam, had been continuously through Merchants' 35 year occupancy in the building, furnished to Merchants, and had been and were furnished to Merchants up to and including October 3, 1951, without interruption, and the Rand McNally Building additionally furnished direct electric current to Merchants' machinery, motors and electrical motor controls, and in addition the Rand McNally Building had the requisite 250 pounds per square foot floor load capacity to accommodate Merchants' heavy machinery. In addition the Rand McNally Building had an interior courtway area and "truck-high" loading docks, and also had the requisite elevator capacity to carry the heavy cases of mat material shipped twice monthly to Merchants up to its quarters on the 8th floor of the Rand McNally Building. There was no other available rental space in the City of Chicago which had the necessary facilities for Merchants' business operations in the months of October and November, 1951.

"4. The Government knew at the time of the acts herein complained of, that Merchants was a tenant in the Rand McNally Building, in possession and occupancy of space, and conducting its manufacturing operations, on the 8th floor of the building under valid leases, and knew it had leased space in the building subject to existing leases: and the Government knew or should have known the nature of Merchants' business operations; and the Government had a duty as a tenant in the building, in making alterations and remodeling the space under lease to it, to have due regard to Merchants' property rights as an occupant of space in the building, and a duty to so carry on such remodeling and alteration work, as not to interfere with, interrupt and disturb Merchants' in carrying on and conducting its business, in the exercise of its rights of possession, beneficial use, enjoyment and occupancy of its space in the building.

"5. Starting on or about the 3rd day of October, 1951, the United States of America through the General Services Administration, an agency of the United States of America, its employees, agents and servants, including contractors, subcontractors and laborers, was engaged in demolition work in alteration and reconstruction of the Rand McNally Building, and in that work knocked down the interior walls of that building on the 8th, 9th and 10th floors of said building in a negligent and unlawful manner, knocking down and laying over on the floor as much as 100 feet of wall at one time, and also drilled through concrete floors and ceilings approximately one foot thick with jackhammers run from air compressors in order to run electrical wiring through the building, and otherwise engaged in negligent activities, such as pulling the wrong fuses in electrical fuse boxes, etc.; all of which created excessive and all pervasive fine plaster dust that freely invaded Merchants' space in the building, and settled on and damaged Merchants' matrices and plastic and copper plates, and upon Merchants' machines and equipment. The continuance of the demolition of walls and alteration work clogged and blocked the corridors outside of Merchants' space so that it was delayed in trucking—on two and four wheel hand trucks—material from one part of its plant to another and from its plant to the elevators, interrupted and cut off the electrical current and live steam normally supplied to Merchants' machinery so that production was delayed as long as three or four hours at a time, and generally created interference and disturbance as well throughout the elevators, corridors, and courtway and other public areas of the building and hampered Merchants' normal use of these areas. The express companies which had previously been making daily pick-ups and deliveries to Merchants were unable to get into the courtway of the building due to the taking over of the courtway by use made by the defendant of the courtway in mixing cement and dropping of debris in the courtway and the clogging thereof by the trucks of defendant in hauling materials and debris in and out of the courtway. The United States of America persisted in these acts and created these interferences and disturbances even though complaints were made by Merchants' employees to Mr. Sloan, Construction Engineer in charge of alteration and reconstruction work in the building for the United States of America (G.S.A.). The United States of America knocked down walls in certain spaces in the building before the existing leases on such space had been cancelled by Clark-Congress Corporation and before such space had been turned over to the Government by Clark-Congress Corporation.

"6. The acts of the United States of America in the building during this period were far above and beyond the usual and ordinary remodeling by one tenant in a building that customarily goes on in a building of this type, occupied by other tenants, and did in fact harass, disturb and interfere materially and abnormally with Merchants' right of possession, beneficial use, enjoyment and occupancy of its space in the building.

"7. Clark-Congress Corporation, its employees and agents, were in control of said building, as lessor to both Merchants and to the United States of America during the period from August 1, 1951, to December 9, and thereafter until December 31, 1951; Clark-Congress Corporation was particularly in control of the elevators, corridors, courtway and other public space in said building, and did nothing to prohibit the improper use of these areas by the United States of America; Mr. Gardner, an employee or agent of Clark-Congress Corporation, was in the building daily during the demolition and alteration work in October, November and December of 1951 and followed the daily course and progress of this work in the building and knew or must be deemed to have known, what was occurring by reason of the Government's actions. Complaints were frequently made by Merchants Matrix Cut Syndicate, Inc., to the Office of the

Building during the time Clark-Congress was lessor and had the duties of management of said building during the period from October 10, 1951, to December 9, 1951, about the serious disturbances to Merchants' possession and beneficial use and enjoyment of the space occupied by Merchants in the Rand McNally Building.

"8. Clark-Congress Corporation through Mr. Gardner and Mr. Roesing cancelled out effective leases to a great number of tenants in said building, and the space in the building covered by said cancelled leases was then immediately turned over to and accepted by the United States of America (G.S.A.), and this was done by Clark-Congress Corporation even though under the lease of June 22, 1951, with the United States of America, Clark-Congress Corporation was not obligated to turn space over to the Government until the vacant space amounted to a contiguous block of 12,000 square feet or more, whereas in fact all said space that was turned over was in smaller amounts than 12,000 square feet, and was not turned over as contiguous space, and thereby caused a further congestion of the elevators and courtway through the moving out of dispossessed tenants.

"9. As a result of the negligence and unlawful acts in demolition, alteration and reconstruction in the building, the excessive dust created by the plaster from the broken walls of the building, and arising from the large pile of rubble in the courtway of the building, delayed Merchants' production, caused extra overtime, caused spoilage and damage to its mats, plates and other products and otherwise seriously interfered with Merchants' possession and beneficial use and enjoyment of the space occupied by it in the Rand McNally Building, and together with the interruption of services such as electrical current and live steam for considerable periods of time, causing delay and extra expense in production, and together with the obstruction of the corridors, delay and interference with the elevator services in the building, clog-ging of the courtway area and blocking off of the loading platforms of the building, seriously interfered with, interrupted and disturbed Merchants' business operations, and rendered the space occupied by Merchants unfit for occupancy for the purposes for which Merchants had leased and occupied it.

"10. These serious interferences with, interruptions of, and disturbance to Merchants Matrix Cut Syndicate's business operations and Merchants' beneficial use, enjoyment and occupancy of the space occupied by Merchants in the Rand McNally Building forced Mr. Allen, President of Merchants, to reach the conclusion on or about November 15, 1951, that he could no longer continue to operate his business in the building because of the disturbance and interference caused by the Government's negligence and unlawful acts in connection with the demolition and alteration work in the building, which caused Merchants to abandon the premises.

"11. Thereupon Mr. J. B. Allen and other officers and employees of Merchants looked for and were unable to find any rental space in the City of Chicago to which to move, as there was no rental space available in the City of Chicago to which Merchants could remove its business operations, as there was no such space that could furnish live steam, 24 hour elevator service, direct electrical current and adequate loading facilities and freight elevators, and requisite floor, load capacity, all essential to Merchants' continued business operations. Thereupon, Merchants was forced to find and did find a partially completed factory building on or about November 20, 1951, and to which building Merchants moved as soon as it had been completed according to Merchants' plans and specifications.

"12. The nature of the business carried on by Merchants in its premises in the Rand McNally Building, and the facilities required to operate its business were such that Merchants was unable to find rental quarters providing adequate facilities to which to move, and Mer-

chants moved out of said building as soon as the partially completed factory building was completed, and said moving was within a reasonable time of the disturbance of its possession, use, occupancy and enjoyment of the premises.

"13. The disturbance to plaintiff's business caused by the continuance by defendant of its negligent and unlawful acts in connection with the demolition and alteration work in the building continued thereafter during the month of December, 1951, and the months that followed, during which time it was impossible for Merchants to remove its machinery and equipment from the building as it had no place to move to until completion of its new factory building on April 23rd, 1952.

"14. The negligent and unlawful acts of the United States of America in interference with and disturbance to the rights of possession, use, enjoyment and occupancy, which started on or about October 3, 1951, continued thereafter throughout the entire remaining period of Merchants Matrix Cut Syndicate, Inc.'s occupancy in the Rand McNally Building, and these negligent and unlawful acts of the United States of America caused Merchants Matrix Cut Syndicate, Inc., to suffer a loss of profits in the sum of $36,747.78.

"15. As a result of the foregoing, Merchants Matrix Cut Syndicate, Inc., has suffered actual damages in the amount of $104,128.18 as follows:

"Fair market value of Merchants' use and occupancy of space in the Rand McNally Building as measured by what next immediate occupier, United States of America, paid for that space under a voluntary lease, namely $3.66 per square foot, less rent reserved in Merchants' lease of $1.54 per square foot; differential $2.12 per square foot, 8600 square feet for 1 year and 9 months from date of eviction to end of term .................................. $31,906.00

Loss of Profits ...................................... 36,747.78

Cost of moving machinery and equipment, value of machines lost and destroyed, and cost of moving machinery and equipment, office furniture, etc., including cost of breaking wall .................................... 9,877.88

Cost of electrical work in moving and relocation ........ 14,649.62

Loss of piping and cost of pipe fitting work in moving and relocation .................................... 5,094.94

Cost re electric typewriters ......................... 302.27

Cost of parts in conversion of Lake Erie Presses ...... 3,443.00

Value (depreciated) of air conditioning equipment destroyed .................................... 2,106.69

Total Damages ........ $104,128.18"

We think the government's argument based upon the statute of limitations is illusory and that under the theory of Rayonier, Inc., v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354, the decision below was correct, 28 U.S.C. §§ 2671–2680, except for the computation of damages.

 Moving expenses which could not be recovered in the condemnation case cannot now be collected, under the Tort Claims Act, from the same sovereign which acquired the property, and interests, in question, by the exercise of its eminent domain power.

Finding of fact numbered 15, entered below, is a list of eight items underlying the total damages of $104,128.18. We cannot, in all fairness to the litigants, undertake a detailed analysis of those

eight items for the purpose of ascertaining whether any moving expenses are, in fact, embedded in any one or all of the listed figures, despite the descriptions accompanying each one of the items. The trial judge, assisted by counsel for both sides, can, as a practical matter, perform this task of determining just what items of moving expenses are lurking in the itemized figures.

For the foregoing reasons the judgment appealed, while correct on the general theory of tort liability, is reversed and remanded to the district court with directions to adjust the damages awarded plaintiff by eliminating any and all elements of moving expenses and then enter judgment, as thus reduced, for plaintiff.

Reversed and remanded with directions.